UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

KEITH HOOVER,

                              Plaintiff,

   v.                                            3:07-cv-0009
COUNTY OF BROOME, et al,

                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THOMAS J. McAVOY
Senior United States District Judge

## DECISION and ORDER

      Plaintiff Keith Hoover commenced the instant action pursuant to 42 U.S.C. § 1983 claiming that he was retaliated against for engaging in protected speech (reporting the assault of an inmate by corrections officers at the Broome County Jail) and asserting violations of his right to due process of law and New York Civil Service Law § 75-b. Presently before the Court is Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56 seeking dismissal of the Complaint in its entirety.

## I.    FACTS

      At all time relevant hereto, Plaintiff Keith Hoover was employed as a corrections officer ("CO") with the Broome County Sheriff's Department ("BCSD"). On June 25, 2005, COs were called to respond to a "Code Yellow" (fight between inmates) at the A-Pod of the Broome County Correctional Facility (the "Facility") involving inmate Theodore Burke (the "Burke incident"). Plaintiff was among the COs that responded to remove Burke. Plaintiff observed as other COs removed Burke from the area.

A day or two after the Burke incident, Plaintiff told Sergeant Ronald Evans that some of the COs used excessive force in removing Burke. Plaintiff also apparently reported an incident concerning another inmate wherein Plaintiff claimed that certain COs destroyed some of the other inmate's property. Plaintiff claims that Sergeant Evans pressured Plaintiff into omitting reference to the destruction of property incident from the report concerning the Burke incident. Evans denies that he pressured Plaintiff in any way.

On July 6, 2005, Plaintiff requested to be considered for participation in the Crisis Management Suicide/Hostage negotiations course. On July 13, 2005, Plaintiff was selected to attend the training. Thereafter, Plaintiff requested to be removed from the training program. Plaintiff never participated in the training program.

On July 14, 2005, Plaintiff was involved in a verbal dispute with a lieutenant at the facility. During that dispute, Plaintiff defied the lieutenant's orders to draft a report; told the lieutenant that he did not have to talk to him until he (Plaintiff) was in uniform; told the lieutenant to get away from him; and used profanity towards the lieutenant. Thereafter, Plaintiff apologized to the lieutenant in person, in writing, and over the AS400 system.[1]

On July 14, 2005, the Broome County Executive issued an Executive Order concerning whistleblower protections.

On July 19, 2005, Plaintiff met with Facility Administrator Mark Smolinsky to discuss the Burke incident. Plaintiff surreptitiously audio-taped a portion of the meeting. Smolinsky advised Plaintiff to file a report regarding the incident. After the meeting, Smolinsky ordered a full investigation of the incident. Stephen Barlow, the Facility's chief investigator, was

---

[1] The AS400 systems appears to be an e-mail or instant messaging type system.

assigned to conduct the investigation. After the investigation, Smolinsky concluded that the COs did not use excessive force upon Burke.[2]

On July 25, 2005, Plaintiff wrote a letter to Smolinky requesting whistleblower protection. The letter requested protection from retaliation by certain employees of the BCSD, including Sergeant Castellano, Sergeant Guinan, Sergeant W. Shea, Sergeant Evans, and investigation officers Borchardt, Connors, and Kleinsmith. The bulk of the letter appears to reference Plaintiff's concern that he would be singled out by other COs because of his complains regarding other COs' activities while at work.[3] Although the letter stated that "I'm writing in response to our talk on 07/20/05,"[4] it makes no mention of the Burke incident. On August 16, 2005, Defendant Sheriff Harder received a copy of the July 25, 2005 letter and discussed the matter with Smolinsky.

On August 10, 2005, Defendant Harder sent Plaintiff a letter requesting written notice of any "prescribed controlled substance and potential side effect of any medication" that Plaintiff was then taking. Plaintiff contends that this request was in furtherance of a conspiracy to retaliate against him for reporting the Burke incident. Defendants claim the

---

[2] Plaintiff disputes this conclusion and submits that there is evidence, including Nurse Alice Morris's statements to Barlow, substantiating his claim of excessive force. Whether the COs responding to the Burke incident used excessive force is immaterial to the issues pending before the Court.

[3] For example, the letter states that Plaintiff has inquired "why a certain core of officers are allowed to watch TV, not be in the hall's [sic] monitoring inmate movement, ensuring the safety of civilian staff, monitoring meal carts at chow pass, etc. Why certain staff are allowed to leave early, be above the rules, and treat less Jr. staff in an offensive way? . . . I am going to report any and all incidents that happen in my view no matter who the person may or may not be. This is why I am asking for 'whistle blower' protection at this time. . . ."

[4] Plaintiff apparently was referring to his conversation with Smolinsky on July 19, 2005. During that conversation, Plaintiff and Smolinsky discussed the Burke incident as well as other matters. Pl's. Stmnt. of Mat. Facts at ¶ 12.

request was made because Plaintiff had been engaging in erratic behavior. Plaintiff complied with the request. No further course of action was taken.

On January 4, 2006, Plaintiff was involved in an incident whereby he used force on an inmate. Plaintiff wrote a report concerning the incident. The inmate also filed a complaint concerning the incident. Smolinsky directed that the matter be investigated. Barlow was assigned to investigate the matter. As a result of the incident, Defendant Undersheriff Gary O'Neill filed administrative charges against Plaintiff. Because these charges were pending, Plaintiff was temporarily reassigned to the overnight shift. On February 3, 2006, Plaintiff admitted to pushing the inmate and using profanity overheard by the public. Plaintiff accepted a three day suspension without pay.

On January 6, 2006, Plaintiff was involved in an argument with another CO regarding visitation practices. Lieutenant Irwin directed both COs to prepare reports concerning the argument. Ultimately, Irwin drafted a memorandum regarding work rules and expectations. The memo was issued to all second shift visitation officers.

Between March 16, 2006 and December 13, 2006, Plaintiff filed 12 grievances with the Undersheriff. The dates these grievances were filed is as follows: (1) March 16, 2005 (4 grievances); (2) April 1, 2006; (3) August 29, 2006; (4) December 1, 2006; (5) December 6, 2006; (6) December 8, 2006; (7) December 12, 2006; and (8) December 13, 2006 (two grievances). Under the grievance procedure in place, a grievant first makes a complaint with the Undersheriff (Step 1). If the grievant is unhappy with the Undersheriff's decision, he may proceed to have the Sheriff review the Undersheriff's decision (Step 2). The next step is to have the Sheriff's decision reviewed by the County's Personnel Officer (Step 3). If the

grievant is still not satisfied after these steps, he may request that the matter proceed to arbitration.

With respect to the April 1 grievance, Plaintiff withdrew his appeal of the Step 1 decision. Plaintiff's August 29 grievance was accepted and the Undersheriff provided the requested relief. The Sheriff ruled in favor of Plaintiff on the December 1 grievance. Plaintiff dropped his December 6 grievance because he accepted the Undersherrif's reasoning. With regard to all the grievances except the December 8 grievance (which was denied for failure to use proper forms), Plaintiff admits that the County attempted to provide him with a good faith explanation of their denials.

On December 13, 2006, Plaintiff (together with his union representative) met with Undersheriff O'Neil to discuss Plaintiff's use of the grievance process. Plaintiff surreptitiously tape-recorded this meeting. The Undersheriff also sent a letter regarding Plaintiff's use of the grievance process to the Union president. Ultimately, Plaintiff directed that all eight of the grievances for which he requested arbitration be withdrawn.

On December 22, 2006, Plaintiff was issued a written counseling for allowing an inmate from another pod to enter the pod in which he was working. Plaintiff drafted a report denying any misconduct.

Plaintiff further alleges that, since he reported the Burke incident, he has been the subject of continued harassment, including being called a "rat bastard," "rat," "snitch" and other similar terms, being held for lengthy times between the locked security doors, and having his locker broken into.

On January 2, 2007, Plaintiff took a leave of absence from work. In January 2008, Plaintiff's employment with the BCSD was terminated.

Plaintiff commenced the instant action claiming that he was retaliated against for reporting the use of excessive force against Burke, that he was denied his right to due process of law, and that Defendants violated N.Y. Civil Service Law § 75-b.

## II.     STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedures governs motions for summary judgment.  It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56( c).  An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant is able to establish a prima facie basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, Rexnord Holdings, Inc. V. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation.

Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).  With this standard in mind, the Court will address Defendants' motion.

## III.     DISCUSSION

### a.     First Amendment

Defendants move to dismiss the First Amendment claim on the ground that Plaintiff was not engaged in protected speech.  It is Defendants' position that Plaintiff made the report concerning the Burke incident pursuant to his official duties as a CO and, therefore, under Garcetti v. Ceballos, 547 U.S. 410, 126 S. Ct. 1951 (2006), Plaintiff's speech was not protected.  Plaintiff responds that he was not merely reporting an incident of misbehavior by an inmate, but was acting as an eyewitness to events in which two of his fellow officers used excessive force against Burke and then attempted to cover it up.

> As the Supreme Court has stated, there are
>
> two inquiries to guide interpretation of the constitutional protections accorded to public employee speech. The first requires determining whether the employee spoke as a citizen on a matter of public concern. . . . If the answer is no, the employee has no First Amendment cause of action based on his . . . employer's reaction to the speech. . . . If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.

Garcetti, 126 S. Ct. at 1958.  Thus, the initial query in this First Amendment claim is whether the plaintiff was speaking pursuant to his official duties as a government employee or as a private citizen on a matter of public concern.[5]

---

[5] Defendants do not argue that Plaintiff's speech was not of public concern.  Rather, their argument is that it is not protected by the First Amendment because the speech was made pursuant to Plaintiff's official duties as a government employee.  Although the Court is inclined to agree with
(continued...)

- 7 -

Determining whether speech is made in the course of one's employment or as a citizen is a fact intensive inquiry. Courts cannot simply look to a broad job description. Garcetti, 126 S. Ct. at 1961. "[A]d hoc or de facto duties can fall within the scope of an employee's official responsibilities." Weisbarth v. Geauga Park Dist., 499 F.3d 538, 544 (6th Cir. 2007). Similarly, the fact that the speech may have been made inside or outside of their workplace or that the speech concerned the employee's employment is not dispositive. Id. at 1959. "The proper inquiry is a practical one." Id. at 1961  Whether speech was made as an employee or private citizen entails an examination of the "content, form, and context of [the] statement, as revealed by the whole record." Rankin v. McPherson, 483 U.S. 378, 107 S. Ct. 2891 (1987).

Considering the totality of the circumstances, including the content, form, and context of the speech, the Court finds that Plaintiff spoke pursuant to his official duties. Relevant BCSD policies support Defendants' position that Plaintiff spoke pursuant to his official duties. For example, the BCDS Correction Division Policy Statement on the Use of Force provides, among other things, that "[w]hen circumstances occur that the immediate use of physical force is reasonable and necessary, officers will report the use of physical

---

[5](...continued)
Plaintiff that his speech is on a matter of public concern, that is not the dispositive inquiry in connection with Defendants' motion. "Even if the speech is of great social importance, it is not protected by the First Amendment so long as it was made pursuant to the worker's official duties." Williams v. Dallas Ind. Sch. Dist., 480 F.3d 689, 692 (5th Cir. 2007); Vose v. Kliment, 506 F.3d 565, 569 (7th Cir. 2007) ("We accept that police misconduct is a matter of public concern, but as this analysis illustrates, that is no longer the initial inquiry on First Amendment retaliation claims."). Accordingly, the Court rejects Plaintiff's contention that "since the defendants appear to concede inmate abuse by use of excessive force by corrections officers is a matter of public concern, this Court should reject defendants' exaggerated reading of the Supreme Court's decision in Garcetti and rule that the exception does not apply in the fact and circumstances presented." Pl.'s Mem. of Law at 11.

force immediately upon conclusion of the incident to the Zone Sergeant." Def.'s Ex. 5. That policy further provides that "Officers will completely document all uses of force" and that "officers that were present [must] submit a written report" documenting the use of force. Id. Section 1.4 of the applicable BCSD Rules of Conduct require COs "who have knowledge of other members who are disobeying order, ordinances, B.C.S.C.O. Rules of Conduct or B.C.S.O orders or directives of any type . . . [to] without unnecessary delay bring the matter to the attention of his/her immediate supervisor." Facility Administrator Smolinsky stated in his affidavit that COs were expected to report instances of misconduct.

Here, the facts support the conclusion that Plaintiff was acting pursuant to his official duties. Several of the officers present at the Burke incident submitted reports concerning the use of force against Burke. Def.'s Ex. 3. Plaintiff himself reported the incident to Sergeant Evans. Compl. at ¶ 32. Plaintiff then reported the incident to Facility Administrator Smolinsky. This is consistent with the above-cited policies and suggests that Plaintiff was acting pursuant to his official position.

Moreover, the undisputed facts in the record do not substantiate Plaintiff's claims that he was merely a witness to the use of excessive force by other officers. To the contrary, the undisputed facts are that Plaintiff was, at all times relevant hereto, acting in his capacity as a CO. Plaintiff was on duty as a CO on the date of the Burke incident. Def.'s Stmnt. of Mat. Facts at ¶ 8,9. Plaintiff was one of the several officers that responded to the "Code Yellow" call for assistance to remove Burke. Id. It was during the course of Plaintiff responding to the "Code Yellow" and providing assistance to the other COs that he claims to have seen certain other COs use excessive force. Thus, Plaintiff did not merely witness the incident, but observed it as a participant in furtherance of his official duties. As noted,

thereafter, Plaintiff and several of the officers reported the incident to their supervisors. The only appreciable difference between Plaintiff's report and those of the other COs is that Plaintiff contended that the other COs used excessive force against Burke whereas the other COs claimed that Burke lost his balance and fell into the door.

The following facts support the conclusion that, considering the record as a whole, Plaintiff spoke pursuant to his official duties:

1. Applicable BCSD policies required Plaintiff to document all uses of force;

2. Applicable BCSD rules of conduct obligated members of the BCSD to report those members who violate the law;

3. Plaintiff observed the incident in the course of his official duties as a CO and as a participant responding to the Code Yellow call to remove inmate Burke, Jan. 3, 2007 Hoover Aff. at ¶ 7;

4. Plaintiff first reported the incident to Sergeant Evans, which was in accordance with the above-noted BCSD policies that require that incidents concerning the use of force be reported to the Zone Sergeant, see Compl. at ¶ 32;

5. Plaintiff reported the incident during work hours; See Gattison v. Township of Irvington, 2007 WL 4591354, at *4 (D.N.J. 2007);

6. All of Plaintiff's reports concerning the incident were made to his supervisors and not to persons outside of the BCSD, see Jan. 3, 2007 Hoover Aff. at ¶ 21 (noting that Plaintiff made "efforts to report through what [he] understood to be the chain of command at

the Broome County Jail for reporting such incidents. . . ."),
Compare Charles v. Grief, — F.3d —, —, 2008 WL 788618 (5th Cir. 2008) ("Moreover, the persons to whom Charles directed his e-mails further distinguishes his speech from that of the plaintiffs in Garcetti and Williams: Charles voiced his complaints externally, to Texas legislators who had oversight authority over the Commission, not internally, to supervisors."); with Freitag v. Ayers, 468 F.3d 528, 546 (9th Cir. 2006) ("To the extent that the jury may have considered internal forms prepared by [the plaintiff], it is clear that, under Ceballos, such activity is *not* constitutionally protected. . . . [The plaintiff] submitted those reports pursuant to her official duties.");

7. There is no evidence in the record that Plaintiff ever attempted to address issues of the use of excessive force outside of the BCSD;

8. There is no evidence in the record that Plaintiff was complaining about widespread or pervasive instances of the use of excessive force by COs at the BCSD, rather than an isolated incident;

9. Plaintiff used a BCSD incident report form for his report;

10. Plaintiff filled out the incident report form pursuant to the directive of Smolinsky, Def.'s Stmnt. of Mat. Facts at ¶ 13;

11. Plaintiff's report concerned the treatment of prisoners and, in particular, Burke, a matter within Plaintiff's job responsibilities. See

>
> Jan. 3, 2007 Hoover Aff. at ¶ 8 ("I had responsibility for managing the pod in which [Burke] was housed.");[6]
>
> 12. Plaintiff was obligated to file an incident report concerning allegations of the excessive use of force, Smolinsky Reply Aff. at ¶ 4; Jan. 3, 2007 Hoover Aff. at ¶ 14 ("I believed that it was my responsibility to report the abusive behavior to my supervisor."); and
>
> 13. Plaintiff filed a report on another occasion involving the use of force on an inmate, Def.'s Stmnt. of Mat. Facts at ¶ 43, thereby supporting the conclusion that he was acting pursuant to his official duties when he reported the earlier Burke incident.

Later, Plaintiff provided a statement to Barlow in furtherance of Barlow's investigation into the Burke incident. This speech, too, is unprotected because it was made pursuant to Barlow's investigation and Plaintiff was required by facility rules to facilitate the investigation by cooperating with Barlow. Smolinsky Reply Aff. at ¶ 10. Accordingly, these statements also were made pursuant to Plaintiff's official duties. See Bradley v. James, 479 F.3d 536, 538 (8th Cir. 2007).

Because the statements were made pursuant to Plaintiff's official duties, his statements are not entitled to First Amendment protection and his First Amendment claims

---

[6] As a CO, Plaintiff's official duties included looking after prisoners and reporting instances of misconduct involving prisoners. See Spiegla v. Hull, 481 F.3d 961, 966 (" As a correctional officer, . . .[plaintiff] also had a more general responsibility to keep the facility secure and report any suspicious behavior by prison inmates, staff, or visitors to her superiors.").

must be dismissed.  See Wesolowski v. Bockelman, 506 F. Supp.2d 118 (N.D.N.Y. 2007) (Kahn, J.).

      **b.**      **Due Process**

Defendants next move to dismiss Plaintiff's due process claims on the ground that he had available remedies through proceedings pursuant to N.Y.C.P.L.R. Art. 78 and arbitration under the applicable collective bargaining agreement.  Plaintiff responds that Defendants' actions were not random and unauthorized and, therefore, he was entitled to a pre-deprivation hearing; an Article 78 proceeding is not proper where the defendant's conduct is intentional; and an Article 78 proceeding was unlikely to provide him with relief to his claim of retaliatory constructive discharge.

With respect to the Sheriff's request for a list of medications Plaintiff was then taking, that did not constitute an adverse employment action and, accordingly, no due process of law was required in connection with that incident.  No action was ever taken against Plaintiff in connection with the request for the list of medications.  With respect to the January 2006 disciplinary charges against Plaintiff, he was given notice and an opportunity to be heard (with representation by his union).  Plaintiff accepted a three-day suspension.  Accordingly, he was afforded all process due in connection with this incident.

That leaves the issue concerning the termination of Plaintiff's employment.  Plaintiff contends that, because of the harassment to which he was subjected, he was forced to take a leave of absence.  Mar. 11, 2008 Hoover Aff. at ¶ 23.  Because Plaintiff was unable to return to the job, he was terminated in January 2008.  Id. at ¶ 24.  Plaintiff does not argue that he did not receive due process of law with regard to his actual termination by the Sheriff.  Rather, Plaintiff maintains that his due process rights were violated because he was subject

to severe work conditions that caused him to take a leave of absence, he was unable to return from the leave of absence because he would be subjected to the same harassment, and, ultimately, was terminated from his employment for failing to return to work. In essence, Plaintiff is claiming a constructive discharge without due process of law.

A public employee who is constructively discharged is deprived of property within the meaning of the Fourteenth Amendment. Parrett v. City of Connersville, Ind., 737 F.2d 690, 694 (7th Cir. 1984); see O'Connor v. Pierson, 426 F.3d 187, 200 (2d Cir. 2005) ("[I]f a [employee] . . . can make out a claim of constructive discharge, then he may have the same right to bring a procedural due process claim that he would have if he were fired."). Assuming, without deciding, that Plaintiff was subjected to a sufficiently hostile work environment, his due process claims must fail. First, Plaintiff was not entitled to pre-deprivation notice and opportunity to be heard. It is difficult to conceive how, in the situation of a constructive discharge, the employer can know when an employee might resign and, thus, whether a hearing is required. See Nunn v. Lynch, 113 Fed. Appx. 55, 60 (6th Cir. 2004) ("Even if the employee can . . . show that his resignation was not voluntary, the employer cannot be required to give notice before an employee takes what appears to be a voluntary act."); Gravitt v. Brown, 74 Fed. Appx. 700, 704 (9th Cir. 2003) ("Because the BNE did not affirmatively terminate Gravitt, it could not have given her notice of her termination and was not on notice itself that a due process hearing was required."). Further, most (if not all) of the alleged harassing conduct is claimed to have been perpetrated by other Corrections Officers. There is insufficient evidence that anyone with final authority over significant employment matters participated in creating a hostile work environment. The evidence concerning the involvement of the Sheriff, Undersheriff, and Facility Administrator is

insufficient to establish that they contributed to, or knowingly allowed, a hostile work environment, or that they conspired with others to create a hostile work environment. Thus, there is insufficient evidence upon which it can reasonably be concluded that the constructive discharge was not random and unauthorized.

Second, assuming Plaintiff was entitled to pre-deprivation notice and an opportunity to be heard, Plaintiff's claims must fail because he had available to him, and failed to use, the four-step grievance procedure previously discussed. See Turinski v. Local 104 Intern. Ass'n of Fire Fighters, 2008 WL 681691, at *3 (3rd Cir. 2008); Adams v. Suozzi, 517 F.3d 124, 128-29 (2d Cir. 2008); Witte v. Wisconsin Dept. of Corrections, 434 F.3d 1031, 1037 (9th Cir. 2006); see also O'Connor v. Pierson, 426 F.3d 187, 198 (2d Cir. 2005). Thus, assuming Plaintiff was forced to resign, he failed to exhaust the grievance process available to him. Id.

Third, Plaintiff also had available to him, and failed to take advantage of, a post-termination hearing through Article 78.[7] Rivera-Powell v. New York City Bd. of Elections, 470 F.3d 458, 466 (2d Cir. 2006); Locurto v. Giuliani, 447 F.3d 159, 171 n.4 (2d Cir. 2006) ("[R]eview via an Article 78 proceeding is sufficient to satisfy due process. . . .").

Accordingly, the due process claims must be dismissed. Having dismissed the federal causes of action, the Court declines to exercise supplemental jurisdiction over any remaining state law claims.

---

[7] Although Plaintiff claims that "it is doubtful that Article 78 provides a remedy," he fails to articulate why. Simply because there may have been numerous actors involved in creating the alleged hostile work environment does not mean that a global remedy could not have been instituted.

### c. **Plaintiff's Cross-Motion for Discovery**

Plaintiff cross-moves for permission to supplement the record upon the receipt of the transcripts of Defendants' deposition testimony. Plaintiff asks the Court to delay a determination of the pending motions until those transcripts are received. Plaintiff fails to identify what information will be obtained from the deposition transcripts that is material to primary issues of whether (1) Plaintiff spoke as a private citizen or pursuant to his official duties; and (2) Plaintiff was deprived of a property right without due process of law. See Gualandi v. Adams, 385 F.3d 236, 244 (2d Cir. 2004) ("To request discovery under Rule 56(f), a party must file an affidavit describing: (1) what facts are sought and how they are to be obtained; (2) how these facts are reasonably expected to raise a genuine issue of material fact; (3) what efforts the affiant has made to obtain them; and (4) why the affiant's efforts were unsuccessful."). Rather, Plaintiff contends that deposition testimony of Smolinsky will demonstrate that he had no basis for writing a certain letter to Plaintiff on the Sheriff's behalf and that the deposition testimony of Sheriff Harder will demonstrate that he was involved in the "decisions being complained of herein, which would be relevant to any qualified immunity defenses. . . ." Benjamin Aff. at ¶¶ 8-9. Having failed to demonstrate that any outstanding discovery is pertinent to the issues addressed herein, the motion is denied.[8]

---

[8] The Court further notes that Plaintiff made the request to supplement the record on March 12, 2008. To date, more than one month later, Plaintiff has not supplied any additional materials to the Court.

## IV.     CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED, Plaintiff's cross-motion for discovery is DENIED, and Plaintiff's Complaint is DISMISSED.

IT IS SO ORDERED.

Dated:April 15, 2008

Thomas J. McAvoy
Senior, U.S. District Judge